52 N.J. 553 (1968)
247 A.2d 320
IN THE MATTER OF THE TRANSFER INHERITANCE TAX ASSESSMENT IN THE ESTATE OF ANNE BOYD LICHTENSTEIN, DECEASED.
LOUISE BOYD DALE AND BANKERS TRUST COMPANY, SURVIVING EXECUTORS OF THE WILL OF ANNE BOYD LICHTENSTEIN, DECEASED, APPELLANTS,
v.
WILLIAM KINGSLEY, ACTING DIRECTOR OF THE DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, RESPONDENT.
The Supreme Court of New Jersey.
Argued May 22, 1967.
Reargued September 27, 1968.
Decided November 4, 1968.
*558 Mr. Harrison F. Durand argued and reargued the cause for appellants (Messrs. Durand, Twombly and Imbriaco, attorneys; Mr. Durand and Mr. Joseph E. Imbriaco, of counsel and on the brief; Mr. Joseph Lester Parsons, III, on the brief).
Mr. Leon S. Wilson, Deputy Attorney General, argued and Mr. Elias Abelson, Deputy Attorney General, reargued the cause for respondent (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney; Mr. Abelson, of counsel and on the brief; Mr. Joseph A. Jansen and Mr. T. Robert Zochowski, Deputy Attorneys General, on the brief).
The opinion of the court was delivered by HALL, J.
This case challenges the assessment of transfer inheritance taxes with respect to three inter vivos trusts created by the decedent, Anne Boyd Lichtenstein ("the settlor"). The first trust took effect on December 30, 1935 ("the 1935 trust"), the second on January 20, 1954 ("the 1954 trust"), and the third on February 7, 1959 ("the 1959 trust"). Her executors' appeal to the Appellate Division from the determination of the Transfer Inheritance Tax Bureau ("the Bureau") was certified on their application prior to argument in that court. R.R. 1:10-1A.
The settlor died on April 1, 1959, at the age of 82, domiciled in New Jersey as she had been at all pertinent times. She left a very substantial testamentary estate, the taxation of which is not involved here. Her survivors  mentioned because they are the principal beneficiaries of the trusts  were her only child, Louise Boyd Dale ("Louise"), born March 30, 1913, Louise's husband, John Denny Dale, then 42 years old (they were married some time after 1935), and the two children of that marriage, Anne Boyd Dale, born January *559 4, 1941, and John Denny Dale, Jr., born October 23, 1947.[1]
At the outset brief reference should be made to some fundamentals, including the taxability provisions of the statute. The New Jersey transfer inheritance tax, N.J.S.A. 54:33-1, et seq., is not a property or estate tax, but a privilege levy on the right of succession to property transferred by "decedents", levied on the transferee, "in certain cases" specified by the legislation (to use the language of the title of L. 1909, c. 228, which is the basis of the present law). Howell v. Edwards, 88 N.J.L. 134 (Sup. Ct. 1915), affirmed o.b. 89 N.J.L. 713 (E. & A. 1916); Maxwell v. Edwards, 89 N.J.L. 446 (Sup. Ct. 1916), affirmed 90 N.J.L. 707 (E. & A. 1917), affirmed sub nom. Maxwell v. Bugbee, 250 U.S. 525, 40 S.Ct. 2, 63 L.Ed. 1124 (1919); In re Roebling's Estate, 89 N.J. Eq. 163 (Prerog. 1918), appeal dismissed, 91 N.J. Eq. 72 (E. & A. 1919); Rogers, New Jersey Transfer Inheritance Tax, § 37-44, pp. 12-17 (1940). It should be kept in mind that a transfer inheritance tax is not and was never intended to be a general gift tax. Symposium on State Inheritance and Estate Taxation, Rottschaefer, Taxation of Transfers Taking Effect in Possession at Grantor's Death, 26 Iowa Law Review 514 (1941). See Swain v. Neeld, 28 N.J. 60, 69 (1958); Montclair Trust Co. v. Zink, 141 N.J. Eq. 401, 405 (Prerog. 1948). New Jersey, unlike a dozen or so other states and the federal government, has no such levy.
The taxability section is N.J.S.A. 54:34-1. It begins, so far as here pertinent: "* * * a tax shall be and is hereby *560 imposed * * * upon the transfer of property, real or personal, * * * or of any interest therein or income therefrom, in trust or otherwise, to or for the use of any transferee, distributee or beneficiary in the following cases:".
Since the tax is keyed to the transfer of property by one deceased and his death is the triggering event, the first "cases" specified are transfers where real or tangible personal property situated in this state or intangible personal property wherever situated is transferred by a resident decedent and where real or tangible personal property within this state is transferred by a non-resident decedent, by intestacy or testamentary disposition. N.J.S.A. 54:34-1, pars. a and b.
The next "cases", set forth in paragraph c of the section, are two categories of pre-death transfers of the same property made by the same classes of decedents:
1. "Where * * * made in contemplation of the death of the grantor, vendor or donor", if, since the amendment of L. 1951, c. 250, made within three years of his death.
2. "Where * * * intended to take effect in possession or enjoyment at or after such death." These provisions, found in the 1909 law and common to state transfer inheritance tax statutes, are, of course, designed to preclude avoidance of the tax by these two particular means because they are substitutes for or substantial equivalents of testate or intestate distributions. Swain v. Neeld, supra (28 N.J., at 68-69). The applicability of both provisions is involved in this case; the former in a conventional situation relating to one of the trusts, the latter on a somewhat novel thesis not passed upon previously by this court.
Paragraph d(1) of the section, also derived from the 1909 law, follows, now reading:
"d. Where by transfer of a resident decedent of real or tangible personal property within this State or intangible property wherever situate, or by transfer of a non-resident decedent of real or tangible personal property within this State, a transferee, distributee or beneficiary comes into the possession or enjoyment therein of:
*561 "(1) An estate in expectancy of any kind or character which is contingent or defeasible, transferred by an instrument taking effect on or after July fourth, one thousand nine hundred and nine [hereinafter referred to as paragraph d(1)'];

* * * * * * * *"
The Bureau applied paragraph d(1) as a basis of taxability of all three of the trusts, contending for the first time in the history of the statute that a separate category, i.e., another "case", of taxable inter vivos transfers, beyond those made in contemplation of death or intended to take effect in possession or enjoyment at or after death, was thereby created.[2]
As to common incidents of the trusts, all were at inception and still are composed of marketable securities. All were expressly stated to be irrevocable and in fact are. The settlor retained no power to alter, amend or terminate or to change the beneficiaries designated therein. The Bureau does not contend to the contrary and does not argue that at inception she retained any realistic beneficial interest in any of them which would pass upon or after her death. None provides that the extent or termination of the income interest or the devolution of the remainder is anywise dependent upon or connected with the death of the settlor. Each completely disposes of the remainder and leaves no unprovided for contingencies. Each instrument recites in substance that the validity, construction and effect of the trust shall be governed by the laws of the State of New York, where all assets apparently have always been kept. Such a *562 provision does not, of course, determine transfer inheritance taxability, which is controlled in this case by the law of New Jersey, the decedent's domicile.
Turning to the particular terms and the Bureau's conclusions as to the taxability of each trust, that created in 1935, before Louise's marriage, provided that she receive the income for life and, upon her death, that the principal be paid over as she should appoint by will. She released this power of appointment in 1942. In default of appointment, the trustees (a New York City bank and two individuals recited as of that city) are directed then "to pay over the same to her issue her surviving, in equal shares, per stirpes and not per capita, or if none be then living, to distribute the same as though said LOUISE BOYD LICHTENSTEIN had died intestate while domiciled in the State of New York and owning such principal and accumulated income". (Her death in 1967, subsequent to that of the settlor, has terminated this trust, the remainder interest thereby becoming immediately payable to her two children in equal shares).
The Bureau's determination (which, for some reason undisclosed by the record, was not made until late 1965), found the life estate became indefeasibly vested and immediately effective at the time of the creation of the trust, which was more than three years prior to the settlor's death, and not taxable under any provision of the statute. It held the remainder to be contingent, as of the date of the settlor's death, "not only as to the identity of the persons who will ultimately take, but also as to the event of their survivorship".
The remainder was determined to be taxable under two theories. The first was pursuant to N.J.S.A. 54:34-1, par. c, on the basis of a transfer intended to take effect in possession or enjoyment at or after the settlor's death. The thesis is that where a remainder in fee simple, after a vested life estate, is contingent, the settlor is left with a common law estate in reversion in title arising by operation of law, which passed on her death under her will to the residuary beneficiaries *563 named there, where it will repose until the death of the life tenant, when it will desert the residuary beneficiaries and vest in the ultimate remaindermen under the trust (or probably more properly stated, it will then be extinguished). It is said that, at the death of the settlor, the transfer of the remainder interest was incomplete in title because "there can be no permanent vesting in full beneficial `possession' and `enjoyment'" in any of the contingent remaindermen until the extinguishment of this reversionary interest in title upon the death of the life tenant, and the transfer of the remainder interest is therefore taxable as taking effect in possession or enjoyment after the settlor's death.
The second theory held to ground taxability was paragraph d(1), on the basis of a transfer said to fall within the four corners of that paragraph, assuming that it was intended thereby to create a separate and distinct category of taxable inter vivos transfers.[3]
The remainder was valued, as of the date of the settlor's death, at almost $900,000 (after deduction of the commuted value of the life estate, N.J.S.A. 54:36-2 and 3). The statute provides that taxes with respect to interests still contingent, although to be based on the value of the property involved as of the date of death, may not be levied or assessed until the person entitled comes into beneficial enjoyment or possession, N.J.S.A. 54:36-3, but does authorize an agreement of compromise to effect an immediate settlement of such taxes, N.J.S.A. 54:36-6. Pursuant thereto, the Bureau offered to accept $35,893 in present payment for that purpose.
*564 The 1954 trust was created for the benefit of Louise's two children, the settlor's grandchildren. The trustees, who are Louise and her husband, were directed to divide the corpus into two equal parts, to be administered as separate trusts for each child. Until each attained the age of 21 years, application of so much of the income as the trustees may deem necessary or advisable for the beneficiary's maintenance, support and education is authorized. At age 21 each is to receive any accumulated income and all the income thereafter. One-half of the principal is payable to the beneficiary at age 30 and the balance at age 35. In the event a beneficiary dies before age 35, that beneficiary's part of the trust is to be paid to his or her issue in equal shares per stirpes and, absent such issue, is to be added to the fund, if still in existence, being administered for the other beneficiary or be paid over to such beneficiary or his or her issue. In default of such issue, the share is to be paid to the mother and father in equal shares or to the survivor of them. If both parents had predeceased, the share is directed to go "to the persons then living who would have been entitled to [the settlor's] property in accordance with the law of the State of New Jersey if [the settlor] had died intestate at that time possessed of said property". By an express provision, the settlor "renounces, relinquishes and disclaims any reversionary or remainder interest in the property now or hereinafter constituting said trust funds".
The Bureau determined the value of the principal of both parts of the trust as of the date of the settlor's death at approximately $2,650,000. It held the whole corpus liable to tax, but only under paragraph d(1) as a transfer wholly contingent or defeasible, both as of the date of the creation of the trust and the date of the settlor's death, on the same thesis as the second basis of taxation with respect to the 1935 trust.[4] It assessed taxes of $4,169.38, immediately payable, *565 on the present value commuted to the date of death, of the income payments made to, and which had thereby vested indefeasibly in, the beneficiaries between the settlor's death and the date of assessment, and offered a compromise settlement of $97,209.43 with respect to the contingent balance of the total corpus.
The 1959 trust was created less than two months before the settlor died, with assets valued at $290,500 as of the date of her death. The trustees are Louise and her husband. The husband is given the income for life. Upon his death, the principal goes to Louise's issue then living in equal shares per stirpes, with provisions for a pour over into the 1954 trust if either of Louise's present children is entitled and is under the age of 35. In default of such issue, the principal goes to Louise, if living, and if not, "to the persons then living who would have been entitled to [the settlor's] property in accordance with the law of the State of New Jersey if [the settlor] had died intestate at that time possessed of said property". Authority is given to the trustee other than the husband to loan the latter out of principal a sum not exceeding $100,000 in any calendar year. The instrument contains the same provision as the 1954 trust of relinquishment, renunciation and disclaimer by the settlor of any reversionary or remainder interest.
The Bureau determined the whole corpus (both life and remainder interests) subject to tax as a transfer made in contemplation of death, the trust having been created within three years of the settlor's death. An immediately payable tax of $9,706.53 was assessed on the commuted value of the life estate as indefeasibly vested and immediately effective at the date of creation. The remainder interest, after deduction of the life estate value, was found to be contingent and *566 also liable to tax, either as a transfer intended to take effect at death on the same reversionary thesis advanced in the case of the 1935 trust or under paragraph d(1) on the thesis projected with respect to the 1935 and 1954 trusts. A compromise tax of $3,854.77 was offered to settle the taxes on the remainder under any of the three theses.

I

Taxability of the Entire Corpus of the 1959 Trust as a Transfer in Contemplation of Death
The second subparagraph of N.J.S.A. 54:34-1, par. c, as amended by L. 1951, c. 250, sets forth the statutory prerequisites of a transfer made in contemplation of death, without, however, defining "in contemplation":
"A transfer by deed, grant, bargain, sale or gift made without adequate valuable consideration and within three years prior to the death of the grantor, vendor or donor of a material part of his estate or in the nature of a final disposition or distribution thereof, shall, in the absence of proof to the contrary, be deemed to have been made in contemplation of death within the meaning of paragraph `c' of this section; but no such transfer made prior to such three-year period shall be deemed or held to have been made in contemplation of death."
The so-called presumptive period was introduced in the statute by L. 1922, c. 174, § 1, p. 294. Until 1951 it stood at two instead of three years and there was no time limitation on transfers which could be considered as made in contemplation of death. The purpose of the 1951 amendment, which was not sponsored by the taxing authority was, according to the statement attached to the bill (1951 Assembly No. 624), to conform the state act in these respects to the federal estate tax law, now 26 U.S.C.A. § 2035 (b), which had been similarly amended the previous year. The thinking behind the federal change, which is equally applicable to the New Jersey amendment, is stated in the Senate Finance Committee report (S. Rept. No. 2375, 81st Cong., 2d Sess., 1950-2 C.B. 524-5) as follows:
*567 "While the inclusion in the gross estate of transfers in contemplation of death has long been regarded as necessary to prevent avoidance of the estate tax, the administration of this feature of the estate tax law has always proved difficult. Principally this is due to the fact that contemplation of death deals with the intent of the transferor. Intent is extremely difficult to establish in any case and becomes increasingly so with the passage of time. Undoubtedly many gifts in contemplation of death have escaped the estate tax because of the difficulty which the Government encounters in reconstructing the motives of the deceased. On the other hand, complaints have been received that the Bureau of Internal Revenue has in some cases asserted that gifts made many years before death were in contemplation of death without having much basis for the assertion. As a result executors of estates are confronted with an unpleasant choice between compromising the asserted tax liability or engaging in expensive and difficult litigation. At the present time this problem hangs over any person who makes a gift, even though he expects to live for many years, unless he can prepare evidence demonstrating that the gift was made primarily for nontax reasons.
"Section [2035(b)] removes from the scope of the contemplation of death clause all transfers made more than 3 years prior to the date of death. On the other hand, the burden of showing that the transfer was not in contemplation of death will be borne by the estate in all cases where the transfer was made within a period of 3 years ending with the date of death. This will strengthen the position of the Government in cases where the transfer occurred between 2 and 3 years prior to the date of death."
It is now firmly settled by the leading modern case of Swain v. Neeld, supra (28 N.J. 60) that the presumption in the statute places the obligation upon the taxpayer to establish by a preponderance of the evidence that a transfer, made within the three-year period and meeting the other specified requisites, was not made in contemplation of death. As Justice Burling put it:
"* * * the language utilized, the introducer's statement [to L. 1922, c. 174], and the fact that the presumption is grounded not only in probability but in fairness and policy as well, cumulatively compel the result that the Legislature intended to shift the burden of ultimate persuasion from the State to the taxpayer where the transfer was made within the specified period." (28 N.J., at 67-68).
The statutory phrase "in contemplation of death" has never been limited in this state to its literal meaning of a gift *568 causa mortis  one made with the known imminence of death. It early came to encompass inter vivos transfers which were, in substance, substitutes for testamentary disposition. Prior to 1951, and especially before the advent of our new judicial system in 1948, a voluminous body of case law had been built up dealing with what amounted to such substitutes, principally in the Prerogative Court to which such matters went in the first instance under the old practice. (Since 1948, determinations of the Bureau are reviewed in the first instance by the Appellate Division (or in this court, as in this case, if certified before argument there) as appeals from a state administrative agency. R.R. 4:88-8(a). So far as we can determine, that tribunal has not had occasion to review any contemplation of death levies governed by the 1951 amendment in the handful of cases that have come before it).
Swain v. Neeld, supra (28 N.J. 60) is the only contemplation case until the present appeal to reach this court since 1948. The case was quite a clear one for taxability, involving an 87 year old decedent in poor health who gave about one-third of her estate outright to natural objects of her bounty approximately two months before death and then, three weeks prior to her demise, made a new will which took the inter vivos transfers into account and clearly indicated they were part of a general testamentary scheme, which the court found to be "the dispositive fact". The occasion was taken, nonetheless, to write comprehensively concerning the test of a transfer in contemplation of death, its obvious purpose being to distill viable guidelines from what it called "the plethora of judicial decisions" and "the contrariety of phraseology of judicial opinions" on the subject for the future use of the Bureau and the courts in administering the current statute with its three-year limitation. This decision therefore became the accepted base for the future, with all the underbrush of earlier opinions cleared away. While Swain dealt with an outright transfer rather than one in trust, the principles laid down are equally applicable and need only be carried forward a bit more specifically to cover *569 the instant situation. In doing so, we ought briefly to recapitulate the essence of that holding.
Whether a particular transfer is, in substance, a substitute for a testamentary disposition depends on the subjective state of mind of the transferor at the time  his intent or motivation in making the transfer. This is a question of fact, as to which the taxpayer bears the burden of persuasion, to be determined through reconstruction of that state of mind as best one can through objective indicia, always having in mind that taxation is a practical matter and never losing sight of common understanding and experience.
As Justice Burling said in Swain with respect to this fact finding process:
"The task of the fact finder is to carefully consider and weigh all of the surrounding circumstances shedding light on the decedent's intent, bearing in mind that quite often the only available witnesses are interested parties. Relevant factors to be considered, as attested by the cases, include, but are not limited to: the age and general condition of health of the donor at the time of making the gift; the time interval between the inter vivos transfer and death; the existence of a desire to evade inheritance taxes; whether or not the inter vivos transfer was part of a testamentary scheme or plan; past history of substantial gifts by the donor; whether or not the gift was made to the natural objects of the donor's bounty; whether or not there existed an emergency situation which may have prompted the donation (e.g., donee's illness requiring large expenditures)." (28 N.J., at 70).
In many cases it will be felt, after considering the proofs under all the available indicia, that the transferor had more than a single motive or reason for making the transfer, one or more of which may be associated with life and one or more with the distribution of property in anticipation of death. Thus the final expression in Swain:
"But irrespective of the existence of any life associated motives, it is sufficient to create a gift in contemplation of death if an impelling motive exists to make a present disposition in lieu of a testamentary disposition." (28 N.J., at 69). (Emphasis added).
*570 The determination whether a particular reason is an impelling one rather than an incidental consideration for the particular transfer is, of course, also a question of fact, albeit frequently a difficult one. We may also say that our own precedents are to be relied upon rather than federal decisions construing the similar contemplation of death provision of the federal estate tax law, since the federal cases hold that the thought of death must be the controlling motive for the transfer, as opposed to one of the motives. See e.g., discussion of federal cases in Nicholas v. Martin, 128 N.J. Eq. 344, 357-358 (Prerog. 1940), modified 127 N.J.L. 35 (Sup. Ct. 1941), affirmed o.b. sub nom. Rutgers v. Martin, 127 N.J.L. 603 (E. & A. 1942).
The one difference between the instant situation and that in Swain, not expressly covered by the guidelines laid down in that decision, is, as earlier pointed out, that there the transfer was outright while here it was by means of a trust, which most probably, as of the date of creation, would continue to exist beyond the expectancy of the life of the settlor. That fact does not automatically or necessarily make the transfer a substitute for testamentary disposition and therefore in contemplation of death. This was settled in Coffin v. Kelly, 133 N.J.L. 252 (E. & A. 1945), where the court said:
"* * * We are left in some doubt as to whether the Vice-Ordinary regarded the creation of a trust to remain effective for a period beyond the probable duration of the life of the donor as creating a legal presumption that the transfer was made in contemplation of death. While the provisions of the trust in that and every other respect were a part of the body of proof from which the court was authorized to, and did, find the fact regarding the donor's intention, the likelihood of continued enjoyment by the beneficiaries of the donor's gifts for a period beyond the normal expectancy of life of the donor did not as a matter of law establish the transactions as transfers made in contemplation of death. * * *" (At pp. 252-253).
The determination of the Bureau in the instant case appears to us to run counter, when it states as one basis *571 for taxability that this "trust indenture is, on its face, clearly testamentary in character" and implies that such a transfer for this reason alone, and regardless of the age, state of health of the settlor or any other circumstances, must be held to have been in contemplation of death. However, we think the error is not fatal and that the ultimate conclusion of taxability may and should be sustained on the evidence, now to be summarized.
The proofs submitted by appellants consisted of ex parte affidavits of Louise, her husband, her mother's physician, nurse and a close friend and the long standing family attorney in New York who prepared this trust indenture, some of whom are to be thought of as interested persons. As might be expected, the affidavits suffer from a certain degree of incompleteness, equivocation and conclusory statements with a partisan slant. The Bureau submitted no proofs of its own. There is nothing in the record to indicate appellants sought to present oral testimony or that the Bureau desired to cross-examine the affiants, evidentiary methods which would ordinarily produce a more satisfactory and generally fairer factual record, particularly from the standpoint of a reviewing court. The Bureau's so-called findings "of evidentiary facts" amount to little more than a synopsis of the averments of each affiant, largely cast in the light most favorable to it, followed by a summary of the reasons leading to the ultimate finding of taxability. Since no element of observation or hearing of witnesses is involved, we may properly reach our own view of the underlying facts.
Louise's husband, John Denny Dale, for a good number of years prior to 1959, had been generally unsuccessful in his business ventures, occasioned in part by two periods of military service. She and her mother (the settlor), both wealthy, had invested about one million dollars in his enterprises, practically all of which had been lost. His annual income consequently fluctuated greatly and frequently was so small that his wife had to provide the major part of the funds required to support the household at the customary *572 high level. For example, in 1958 his income was but $1,700, while his wife's was almost $100,000. This financial situation had led to marital discord, which had been fairly acute from 1955 on, with considerable talk of divorce. Mrs. Lichtenstein knew this. She was greatly opposed to a break-up of the marriage and keenly interested in doing everything reasonably possible to prevent that result. In this posture of affairs, he sought further financial help from her, which ultimately led to the creation of this trust in February 1959, a little less than two months before her death.
Mrs. Lichtenstein had become 82 years of age on August 30, 1958. It is clear that until her last illness she was in good health and an unusually vigorous woman, physically and mentally, for her age, with her activities and outlook directed toward continued life rather than death. Her physician places the last illness as commencing in December 1958, and lasting until death on April 1, 1959, although she had had a nurse-companion in constant attendance since the fall of 1958. It also seems clear that the last illness, by reason of its nature, was slowly progressive rather than a sudden breakdown at inception and a mere "hanging on" until the end came. It is further evident that the ultimate finality of the illness became apparent to her, as well as to her relatives and friends, some little time before death. Whether her realization occurred before or after this trust was decided upon and executed is not entirely plain. The probability appears to be that she appreciated she was not going to recover by that time, although the fact seems quite immaterial since the Bureau in its brief practically concedes that the creation of the trust was not in any way motivated by the anticipation of imminent death.
At this point, it may be noted that Mrs. Lichtenstein made a new will on January 2, 1959, which left only a $35,000 legacy to her son-in-law  the same provision she had made for him in her wills over the past several years. (There is nothing in the record to indicate whether he knew this). She left her residuary estate one-half to Louise outright, *573 amounting to about one million dollars, and the other half in trust, with the income to Louise for life and the remainder to the latter's issue. Her total testamentary estate grossed about $3,600,000.
The proofs are not in agreement as to just when Mr. Dale approached his mother-in-law for financial assistance. He and Louise speak of the time variously as "in 1958", "in the latter half of 1958" and "in November 1958". The nurse places the conference in January, 1959, presumably after the new will was executed early in that month. We believe the latter time more probably to be correct, at least as far as serious pleading and decision were concerned, because the attorney's office diary entries annexed to his affidavit show the first conference thereon on January 22 with Louise. There is no doubt that Dale asked her for an outright gift of 3,500 shares of a stock which she owned in large quantity, which would be expected to provide five to ten thousand dollars in dividends annually. There is also no doubt that he urged the gift on the basis of saving the marriage, both by providing him with new capital to place his financial position on a sounder footing and with a basic income irrespective of fluctuations in his earned income. We are convinced Mrs. Lichtenstein reacted favorably to the proposal, actuated by her desperate desire to preserve the marriage. Indeed, the Bureau concedes that this was the real moving purpose behind the making of the gift, but this fact does not preclude taxability.
Mrs. Lichtenstein had Louise discuss the matter with the family attorney. The latter advised placing the stock in trust, with income to the son-in-law for life and remainder to the children, as previously outlined. His affidavit does not disclose the reason for his advice. It could well have been that, based on past experience, safeguarding the gift principal from dissipation was much more likely to accomplish the purpose of future marriage preservation. The settlor concurred in the advice and subsequently agreed to Mr. Dale's further importuning to give him the right to borrow up to *574 $100,000 from the principal in any one calendar year. The indenture was then promptly prepared and executed.
In this evidentiary complex, we seek, as the court did in Swain v. Neeld, supra (28 N.J. 60), the dispositive fact or facts determinative of whether an impelling post mortem motive or intent existed in the settlor's mind with respect to the transfer which was made. Had it taken the form of the outright gift first sought, the case would be a much more difficult one for taxability from the contemplation of death standpoint for the emphasis would have primarily been on the life associated motive of making a large amount of capital immediately and fully available for the use of the transferee, as well as furnishing income both presently and in the future.
While the taxability of the transfer as it eventuated is not so obvious as to be beyond all debate, there are sufficient indicia to hold it to be so. The deliberate choice of the particular trust format and terms used, for whatever reason the attorney may have advised, changed not only the quality and scope of the gift, but substantially shifted the emphasis to past mortem aspects. The primary donee's interest was sharply curtailed. Especially, use of the principal was closely confined (his first borrowing therefrom was not accomplished until 1961 and then only to the extent of $4,500) and it was required to be preserved for ultimate distribution to the transferor's grandchildren, most probably not to occur until long after the transferor's demise. While the income interest was retained in the son-in-law, no longer was the amount thereof within his sole control through choice of investments because of the trustees' obligation to safeguard the remainder interest. All of this smacks essentially of an inter vivos substitute for a testamentary disposition by a settlor close to the end of her days seeking to preserve her daughter's marriage indefinitely. Under all the circumstances, it was the kind of disposition which, except for income for the balance of the settlor's life, could as well have been made by will or codicil. So it cannot be said with assurance that the after *575 death purpose was not at least one of the impelling motives in her mind for the form the transfer took. It is enough for taxability that the distinct probability of such an actuating motive reasonably persists. We therefore conclude that the Bureau was correct in determining that appellants had failed to sustain the burden of persuasion that the transfer was not made in contemplation of death.
The Bureau's assessment with respect to the 1959 trust is sustained.[5]

II

Taxability of the Remainders of the 1935 and 1959 Trusts as Transfers to Take Effect At or After Death
In putting in proper context consideration of the Bureau's theory of taxability of the remainders of the 1935 and 1959 trusts under the "at or after death" statutory provision, we start with the proposition, briefly adverted to earlier, that, policywise, the fundamental purpose of the provision is to prevent avoidance of the tax by a lifetime transfer made in the place and stead of a testamentary disposition. The intended scope thereof has probably not been better analyzed than by Vice-Ordinary Buchanan, the author of most pre-1948 opinions in this field, in In re Brockett, 111 N.J. Eq. 183 (Prerog. 1932):
"Concededly the statute neither purports, nor was intended, to tax an immediately effective gift of the absolute title to a property (unless in contemplation of death). Neither would a tax be collectible *576 where the donor, A, gives to B a life estate for B's life and remainder at B's death to C; it is, of course, possible that B may survive A, but C's enjoyment of the remainder is not by the terms of the gift postponed until after the death of the donor, A.
"Such postponement is not intended, and hence does not come within the terms of the statute. Neither does it come within the general object or design of the statute, for the transfer is not one in lieu of a testamentary disposition, but is a present gift, whereby the donor parts immediately and irrevocably with all interest in the property. If the legislature had been concerned with the fact that the remainderman, C, might not come into possession or enjoyment until after the donor's death, it could readily have provided that a tax should be levied in that contingency. Its failure so to provide indicates that it was not so concerned." (At pp. 188-189).
Thus, in the case of transfers in trust, taxability has been found where:
(1) the settlor retained income or some benefit for his life with remainder over on his death, Carter v. Bugbee, 91 N.J.L. 438 (Sup. Ct. 1918), affirmed 92 N.J.L. 390 (E. & A. 1919); American Board of Commissioners, etc. v. Bugbee, 98 N.J.L. 84 (Sup. Ct. 1922); In re Brockett, supra (111 N.J. Eq. 183); Central Hanover Bank and Trust Co. v. Martin, 129 N.J. Eq. 186 (Prerog. 1941), affirmed o.b. 127 N.J.L. 468 (Sup. Ct. 1942), affirmed 129 N.J.L. 127 (E. & A. 1942), affirmed, sub nom., Central Hanover Bank & Trust Co. v. Kelly, 319 U.S. 94, 63 S.Ct. 945, 87 L.Ed. 1282 (1943); Pennsylvania Co. For Insurance On Lives, etc. v. Kelly, 134 N.J. Eq. 120 (Prerog. 1943); Avery v. Walsh, 138 N.J. Eq. 80 (Prerog. 1946); Cf. City Bank Farmers Trust Co. v. McCutcheon, 8 N.J. Misc. 547, 151 A. 78 (Sup. Ct. 1930), affirmed o.b. 108 N.J.L. 185 (E. & A. 1931);
(2) the settlor retained for his life power to amend or terminate the trust or to change beneficial interests, In re Fosdick, 102 N.J. Eq. 45 (Prerog. 1927); Plainfield Trust Co. v. McCutcheon, 8 N.J. Misc. 593, 151 A. 279 (Sup. Ct. 1930), affirmed o.b. 108 N.J.L. 201 (E. & A. 1931); Renwick v. Martin, 126 N.J. Eq. 564 (Prerog. 1939); Pennsylvania *577 Co. For Insurance On Lives, etc. v. Kelly, supra (134 N.J. Eq. 120);
(3) the settlor retained a remainder interest to himself. In re Fosdick, supra (102 N.J. Eq. 45).
The more recent cases dealing with the provision have been principally concerned with applying these principles, with the same approach and looking to the substance rather than the form of the scheme, to more refined factual situations and devices, such as reciprocal trusts and agreements, annuities and the like. Schroeder v. Zink, 4 N.J. 1 (1950); Cruthers v. Neeld, 14 N.J. 497 (1954); Newberry v. Walsh, 20 N.J. 484 (1956); Darr v. Kervick, 31 N.J. 476 (1960); Tilney v. Kingsley, 43 N.J. 289 (1964); Bose v. Division of Taxation, 5 N.J. Super. 266 (App. Div. 1949), certif. den. 4 N.J. 74 (1950).
The scope of the provision has also been extended to include the case where the trust income is given to a third person for the life of the settlor, with remainder over thereafter, a matter on which there has long been a split of authority among the jurisdictions. See Chase v. Commissioner of Taxation, 226 Minn. 521, 33 N.W.2d 706, 6 A.L.R.2d 214 (1948) and cases discussed therein. Vice-Ordinary Buchanan, in Koch v. McCutcheon, 111 N.J. Eq. 324 (Prerog. 1932), first held the remainder in this situation was not taxable in line with the thought he expressed in Brockett, supra, following the language therefrom we previously quoted. The Supreme Court reversed, 111 N.J.L. 154 (1933). The Prerogative Court followed the Supreme Court in a subsequent case, In re Hollander, 123 N.J. Eq. 52 (1938) and the Court of Errors and Appeals approved in Hartford v. Martin, 122 N.J.L. 283 (E. & A. 1939). The thesis was that such a transfer fell within the literal language of the statute because the ultimate beneficiary could not take until after the death of the settlor and so was dependent upon the latter's demise. Perhaps the more realistic reason was that suggested by the Supreme Court in Koch and also commented on in Hollander  governing the life estate by *578 the settlor's life is too indicative, in a family situation, of unsaid retained control by the settlor or at least furtherance of some lifetime purpose of his own.
So taxability in this state under the "at or after death" provision has required that the settlor retain in himself some realistic interest, power or control or some other "string" during his lifetime, or his death must be the determinative and indispensable event in the shifting of economic benefits and burdens. Otherwise the transfer is not taxable under this provision. See e.g., In re Kellogg, 123 N.J. Eq. 322 (Prerog. 1938); Nazzaro v. Neeld, 18 N.J. Super. 56 (App. Div. 1952).
There cannot be the slightest doubt that the trust transfers here involved do not meet these prerequisites and do not fall within the previously outlined scope and intent of the statutory provision. The settlor retained no realistic beneficial interest or power whatever. The divestment was complete at inception without any possibility of reverter in fact. Every possible contingency is covered. A final remainder to intestate takers precludes any failure of ultimate disposition. As Judge Swan said in Commissioner v. Bayne's Estate, 155 F.2d 475, 477, 167 A.L.R. 436 (2 Cir. 1946), in dealing with the then similar provision of the federal estate tax law: "Strictly there can never be a failure of next of kin, even though a failure to ascertain them may result in an escheat." See to the same effect, Central Hanover Bank & Trust Co. v. Martin, supra (129 N.J. Eq., at 209). It is difficult to conceive of any trust transfer which on its face could be more complete than those here involved.
The Bureau does not cite to us any case anywhere holding a like transfer to be taxable under the "at or after death" provision and we have found none. It seeks to rely on one state and two federal cases construing the "at or after death" provisions of their respective statutes. Miller v. Connelly, 142 Conn. 144, 112 A.2d 202 (1955) (but cf. Bridgeport-City Trust Co. v. Sullivan, 146 Conn. 184, 148 A.2d 549 (1959)); Commissioner v. Bank of California, 155 *579 F.2d 1 (9 Cir. 1946), cert. den., 329 U.S. 725, 67 S.Ct. 73, 91 L.Ed. 628 (1946); Spiegel's Estate v. Commissioner, 335 U.S. 701, 69 S.Ct. 301, 93 L.Ed. 330 (1949), to which may be added Commissioner v. Bayne's Estate, supra (155 F.2d 475). These cases all differ from ours in one vital aspect. In each the settlor did not provide, as here, for all possible contingencies with respect to the remainder. He stopped short at certain specified beneficiaries, so that the possibility of failure of the remainder and reverting of the corpus to him by operation of law actually existed, however remote, should all of the designated remaindermen predecease him. Although there is broad and loose language in some of these opinions, the cases all turn on this possibility of reverter, an admitted impossibility in the instant situation by reason of the express ultimate contingency of intestate takers. Whether New Jersey would follow the so-called rule of Spiegel, i.e., where the settlor fails to provide for all contingencies, the mere possibility of reverter to him by operation of law is sufficient to make the entire corpus taxable, in a similar factual situation need not be decided here. There are at least two early affirmative intimations. See In re Brockett, supra (111 N.J. Eq., at 189); Central Hanover Bank & Trust Co. v. Martin, supra (129 N.J. Eq., at 212.[6] All the cases we have found where the trust *580 provides for all possible contingencies hold that by reason thereof the transfer is not taxable as "at or after death." Commissioner v. Hall's Estate, 153 F.2d 172 (2 Cir. 1946); Department of Revenue v. Kentucky Trust Co., 313 S.W.2d 401 (Ky. Ct. of App. 1958). Cf. Commissioner v. Marshall's Estate, 203 F.2d 534 (3 Cir. 1953). We conceive that the Bureau gains no support for taxability here on the basis of precedent.
What the Bureau really urges is an extension of the present scope of the "at or after death" provision to encompass even realistically complete transfers in trust on the technical basis of the common law real property doctrine of a retained reversionary interest. To reiterate, that doctrine, as put by the Bureau, is that a settlor retains, by operation of law on the creation of the trust, a reversionary interest in title, where there is a vested life estate followed by a contingent remainder (we assume arguendo the remainders here are contingent), which passes on the settlor's death under his will or by intestacy and reposes pursuant thereto pending the death of the life tenant, when it is extinguished, *581 until which latter event the remainderman entitled to possession and enjoyment of the corpus does not receive the complete interest in the property. Ergo, the Bureau claims there has been a transfer to the ultimate remainderman intended to take effect in possession and enjoyment after the settlor's death.
The contention does not rest upon any possibility that the settlor can ever regain the corpus; indeed, by hypothesis he cannot, since all possible contingencies have been provided for, and so any such reversionary interest, on the basis of which the whole corpus is sought to be swept back into the realm of taxability, is utterly artificial and valueless. In this regard, the Bureau treats the 1935 and 1959 trusts identically, although the provisions for final contingencies are different.[7] We shall treat the argument as it is presented, although we firmly believe that such highly technical concepts of property law have no proper place in the very practical field of taxation. As the United States Supreme Court said in Klein v. United States, 283 U.S. 231, 234, 51 S.Ct. 398, 399, 75 L.Ed. 996, 999 (1931), "[n]othing is to be gained by multiplying words in respect of the various niceties of the art of conveyancing or the law of contingent or vested remainders". See also Plainfield Trust Co. v. McCutcheon, supra (8 N.J. Misc. at 595, 151 A. at 280).
To attempt to make its point, the Bureau's brief led us on an extended excursion through the briery thicket of *582 feudal property law and the intricate vagaries of future interests. We are convinced, however, that the thesis is legally inapplicable by reason of other pertinent law, as well as being contrary to the policy and intended scope of the statutory provision as earlier pointed out.
We agree that this rule of a reversionary interest in title remaining in a grantor under the circumstances mentioned did exist in the common law of real property. 1 Simes and Smith, The Law of Future Interests (2nd Ed. 1956) § 85; 1 American Law of Property, § 4.18, p. 435 (1952). The rule prevailed in New Jersey and apparently is still viable in appropriate situations. Fidelity-Philadelphia Trust Co. v. Harloff, 133 N.J. Eq. 44, 51-52 (Ch. 1943). Seemingly the principle may also be effective in the field of personal property. Miller v. Woodbury Trust Co., 2 N.J. Super. 497, 503 (Ch. Div. 1949); Wright v. Renehan, 10 N.J. Super. 363, 372 (Ch. Div. 1950). Where the form of the grant or transfer is in trust, with the bare legal title in the trustee, the income beneficiary for life holding an equitable life estate and the remainderman's interest also being equitable, the reversion concept is more properly expressed by the terminology of a resulting trust. See 5 Scott on Trusts (3rd Ed. 1967), § 411.2. These principles have also similarly prevailed in New York.
The basic rule was of feudal origin and its ramifications and the reasons behind it were connected with that ancient *583 system of land tenure and its incidents, which need not be gone into in any detail for they have largely become anachronistic. The one reason deserving brief mention because of its relation to the question before us is the intertwined and hoary doctrine of worthier title. Summarily stated with respect to the format of the transfer here involved, it is that where prior estates are created in others, an ultimate estate expressly granted to the heirs or next of kin is ineffective and if they take, they do so not by purchase pursuant to the provisions of the instrument, but by descent through operation of law by means of the reversion in title retained by the grantor. The latter devolution was considered more worthy apparently because of the greater advantage in feudal incidents thereby accruing to the lord of the manor. 3 Walsh, Commentaries on the Law of Real Property, § 289 (1947). The doctrine has been much criticized and has been substantially changed in effect by case law or abolished by statute in England and many states (e.g., in New York, effective Sept. 1, 1967, by section 6-5.9 of the Estates, Powers and Trusts Law, McKinney's Consol. Laws, c. 17-b; see 3 Simes and Smith, supra, § 1608 (1967 pocket parts)). We will shortly deal with New Jersey's view of the doctrine and the consequent inapplicability of the reversionary interest theory to this case.
Before doing so we should refer to another facet demonstrating the hypertechnicality and basic unsoundness of the Bureau's theory as attempted to be applied to death taxes. It concedes (see note 4, supra) that the theory would not apply to the 1954 trust since the income interests there are less than freehold estates, although all the other incidents of the trust are strictly comparable, as far as ultimate devolution is concerned, to the 1935 and 1959 trusts. Insubstantiality is further demonstrated by the fact that the theory breaks down if the income beneficiary in these trusts predeceased the settlor, which would result in the full vesting of the remainder and extinguishment of any reversionary interest in the settlor before the latter's death. Even on *584 the Bureau's theory, there would not be taxability, since the transfer took effect before and not at or after such death.[8]
More importantly, however, we think there is no retained reversionary interest in the case of these trusts by reason of a recent decision of this court. Clark v. Judge, 44 N.J. 550 (1965), affirming o.b. 84 N.J. Super. 35, 44-53 (Ch. Div. 1964). Cf. In re Voorhees, 93 N.J. Super. 293 (App. Div. 1967). Although the facts were somewhat different, the resolution of the question presented in Clark depended, broadly speaking, upon whether the reversionary interest retained in the settlor by operation of law of the remainder set forth in the indenture controlled. The trial court, adopting the New York view (before the 1967 statute above referred to), which both sides have argued in our case because of the trust provisions stating that the law of that state should control, held:
"* * * the Doctrine of Worthier Title exists in New Jersey as a rule of construction, creating an inference or presumption that a settlor intends to create a reversion, but that the inferred or presumed intention may be overcome by evidence showing a contrary intention. Generally, a settlor's intention must be ascertained from the terms of the entire trust taken as a whole." (84 N.J. Super., at 49).
The conclusion there was that the presumption had been overcome and that the settlor intended to create a remainder and, in substance, that any reversion arising by operation of law was thereby annulled. The principal factors relied on exist to an even greater extent here, viz.: that the settlor intended to make a full and complete disposition of the property and retained no sufficiently substantial power over or interest in it. Here, the settlor retained absolutely nothing. We therefore conclude that she intended to create *585 a remainder completely disposing of the corpus and no reversionary interest remained in her or her distributees under her will. We think this basic rationale is applicable to the 1935 trust as well as to that created in 1959 even though the ultimate contingent remaindermen in the former were the life tenant's intestate takers and not her own.
In this connection we ought also to mention the earlier quoted clause in the 1959 trust (found in the 1954 trust as well) whereby the settlor expressly disclaimed any reversionary or remainder interest in the trust property. Appellants argue that this clause, in and of itself, effectively divested the settlor of any possible future interest in the trust. The Bureau responds that the provision, contended to be akin to a release, is void because it fails to identify the intended releasee. We need not pass on that question. (As to such releases, see N.J.S.A. 54:34-1.1, L. 1955, c. 135 and statement annexed to the bill). The clause in question is not a disclaimer made subsequent to the creation of the trust, but a mere declaration, as part of its creation, of the settlor's intention. As such, it strongly buttresses our conclusion that she intended that the corpus interest pass by way of remainder and not through any reversion. See Department of Revenue v. Kentucky Trust Co., supra (313 S.W.2d 401).
We therefore hold that the Bureau's reversionary interest theory is legally inapplicable and that for this and the other reasons expressed, the 1935 and 1959 trust remainders are not taxable under the "at or after death provision" of N.J.S.A. 54:34-1 par. c.

III

Taxability of the Remainder of the 1935 and 1959 Trusts and the Whole Corpus of the 1954 Trust under Paragraph d(1)
As we said earlier, the Bureau taxed the whole corpus of the 1954 trust solely on the basis of paragraph d(1), in addition to applying it as an extra foundation for taxing *586 the remainders of the other two trusts. Paragraph d(1), it will be recalled, reads as follows:
"d. Where by transfer of a resident decedent of real or tangible personal property within this State or intangible property wherever situate, or by transfer of a nonresident decedent of real or tangible personal property within this State, a transferee, distributee or beneficiary comes into the possession or enjoyment therein of:
"(1) An estate in expectancy of any kind or character which is contingent or defeasible, transferred by an instrument taking effect on or after July fourth, one thousand nine hundred and nine;

* * * * * * * *"
The date of July 4, 1909 was the effective date of L. 1909, c. 228, the basis of the present law, in which the subsection first appeared in essentially its current form.
The Bureau's thesis is that paragraph d(1) created a separate and additional category of taxable inter vivos transfers, beyond those made within three years of death in contemplation thereof or intended to take effect at or after death, included all lifetime transfers which, at the time of creation, involved some contingent or defeasible interest not resolved at the date of the transferor's death.[9]
In its original brief and at the first argument, the Bureau sought to support its position simply by arguing that such is the literal meaning of the paragraph language and that the provisions of the trusts here involved fall squarely within it. (Again we assume that the respective interests here concerned are contingent). No attempt was made to *587 meet appellants' contention that the legislative history demonstrates a quite different purpose for the paragraph. We therefore requested supplemental briefs and reargument dealing particularly with such history as well as the Bureau's application of the paragraph over the years. This history necessarily includes the predecessors of our 1909 act as well as the development and interpretation of the New York provisions, the basic source of our statutes in this field. In this connection it is to be noted that our courts have long held that we will follow, or at least give great weight, to New York's interpretation of its statutes. See e.g., Carter v. Bugbee, supra (91 N.J.L., at 439-440).
First, speaking generally, early inheritance tax legislation was, according to an historian of state death duties, Symposium on State Inheritance and Estate Taxation, Oakes, Development of American State Death Taxes, 26 Iowa L. Rev. 451, 463-464, 465 (1941), exceedingly simple and sparse in its provisions. Weaknesses in substance as well as difficulties in administration developed in many states in the early days. Among the problems were whether transfers involving future interests were taxable at all  and if so, on what basis, to what extent, how the tax was to be calculated, and when it was to be assessed and paid. Another much agitated question was that of retroactivity, viz., granting the taxability of future interests, particularly contingent ones, could a statute reach situations where the original transfer was made before its passage, but the final devolution occurred after it. These problems resulted in considerable amendatory or new legislation designed to clarify the extent and method of taxation and to facilitate administration. Essentially this was the experience in New York; and it led to a course of statutory development there, which was later largely followed in New Jersey.
Consideration of our legislative history, although incomplete in some respects by reason of the length of time which has elapsed, convinces us that the sole intended meaning and purpose of paragraph d(1) must have been to insure *588 and clarify the taxation of both testamentary transfers and inter vivos transfers, made in contemplation of death or intended to take effect at or after death, which involved contingent and defeasible interests. Its purpose was not to create an additional taxable category.
New Jersey's first inheritance tax statute was L. 1892, c. 122, p. 206, essentially a copy of New York's first enactment, L. 1885, c. 483, of that state. (Ours was reenacted with no changes material here by L. 1893, c. 210, p. 367, and L. 1894, c. 210, p. 318). The tax was imposed on the property transferred rather than on the transfer itself, and the statute exempted property passing to lineal descendants or ancestors of the transferor. The impost was at the flat rate of five per cent, irrespective of the identity of the taxable transferee and the amount of property transferred.
The taxability provisions were sparse and general. Section 1 of the law in substance subjected to the tax all property or any interest therein or income therefrom which passed to non-exempt persons or entities by will or intestacy or by inter vivos transfer intended to take effect in possession or enjoyment at or after the transferor's death, in trust or otherwise, "or by reason whereof any person or body politic or corporate shall become beneficially entitled, in possession or expectancy, to such property or to the income thereof." Section 4 specified that all taxes, "unless otherwise herein provided for," should be due and payable at the death of the transferor, with interest penalties keyed to that date, and section 13 required the surrogate or ordinary to appoint an appraiser "as often as and whenever occasion may require," whose duty it was to appraise the property at its fair market value.
The only situation specifically "otherwise provided for" was that covered by section 2. It dealt only with the case where, by death or pre-death transfer, an interest for life or for a term of years, was given to a tax-exempt person, with the remainder to non-exempt persons or entities. In such event it directed that the property should be appraised *589 immediately upon the death of the transferor at its then fair market value. The value of the exempt life estate or term of years was then to be deducted and the tax computed on the non-exempt remainder, which was declared to be immediately due and payable, with the proviso that payment could he postponed until the time of actual possession or enjoyment if the remainderman furnished a bond for three times the amount of the tax to assure its ultimate payment with interest.
While section 1 could be said to be general enough to make taxable transferred property involving contingent as well as vested future interests, and section 2 to be broad enough to encompass contingent as well as vested remainders (in the narrow situation it covered), the taxation scheme of section 4, declaring the tax immediately due and payable at the transferor's death, was administratively unworkable, at least in the cases of all transfers involving a contingency not precisely fitting within section 2. If the remainder were contingent, one could not tell at the transferor's death when any tax was to be computed and was due, who the ultimate transferees would be, whether or not any of them fell within the non-exempt taxable category so as to determine how much of the corpus would be taxable, and what the quantum of each taxable share would be, so as to enable the ascertainment of the tax due by each non-exempt remainderman. This deficiency was especially marked when the contingency was completely unbounded, as where the income beneficiary was given an unlimited power to appoint the corpus upon his death or where in his own discretion he had the right to invade the corpus.
These incongruities led to early litigation in New York fundamentally based on the claim that, since the administrative provisions of its 1885 law, to which our 1892 act corresponded, did not prescribe the mechanics of taxation of transfers involving such contingent future interests, such transfers were not within the contemplation of the statute and the property comprising them could not be taxed despite the *590 general language of section 1. See In re Cager's Will, 111 N.Y. 343, 18 N.E. 866 (1888); In re Stewart's Estate, 131 N.Y. 274, 30 N.E. 184, 14 L.R.A. 836 (1892); In re Curtis' Estate, 142 N.Y. 210, 36 N.E. 887 (1894). Cf. In re Leavitt's Estate, 4 N.Y.S. 179 (Sur. Ct. 1889); In re Seaman's Estate, 147 N.Y. 69, 78, 41 N.E. 401, 403 (1895). See generally, Dos Passos, The Law of Collateral and Direct Inheritance, Legacy and Succession Taxes, § 58 (b), p. 285, et seq. (2nd ed. 1895).
In Cager, the life tenant, the testator's widow, was given a life estate with power to invade the corpus during her lifetime, with remainder over to non-exempt persons. The court held that, since the remainder was contingent on the exercise of the power, it could not be valued at the date of the testator's death (the case did not fit within section 2 of the statute) and thus the property comprising it was not subject to tax. The question was reserved as to whether the remainder could be appraised and taxed when the remaindermen ultimately came into possession of whatever was left of the corpus, the court saying: "It may be that the tax will be altogether lost to the state if an appraisal is not now allowed; but, if so, the fault lies in the act itself, and not in the construction which its language requires to be put upon it." (18 N.E., at 868).
In Stewart, the will left property to a trustee to apply for charitable purposes so much thereof as he thought expedient, with power to appoint the remaining balance among the legatees otherwise named in the will, some of whom were in the non-exempt class. After the trustee exercised the power, some three years after the testatrix's death, the Surrogate appointed an appraiser to value the property which passed to persons in the taxable category, and he levied tax accordingly. The court said:
"* * * The claim of the appointees under the power must be allowed if the statute provides no scheme for the taxation of contingent and uncertain interests, although such interests may be within the purview of the first section. It is not enough for the *591 legislature to declare that such interests are taxable. If no mode is provided for assessing and collecting the tax, the law is imperfect, and cannot, as to such interests, be executed. * * *" (30 N.E. at 186-187).
It decided, however, that section 1 was broad enough to sanction taxability in these circumstances and section 13, the general appraisal section, would permit an appraisal and assessment after the exercise of the power, when the identity of the appointees and the quantum of their respective interests became fixed. The court reached this result despite the admitted fact that section 4 required payment, and thus ascertainment, of the tax at the testator's death except as otherwise provided and that the only such contrary provision was section 2, obviously not applicable to the case before the court. Curtis reached essentially the same result on the same theory where the identity of the remaindermen of testamentary trusts could not be determined until the death of the life tenants.
The same question arose in New Jersey, in a power of appointment case, prior to the adoption of the 1909 act. Hoyt v. Hancock, 65 N.J. Eq. 688 (Prerog. 1903). There, the court, specifically relying upon Stewart, construed our statute in favor of taxability.
While these judicial decisions saved taxability in the factual situations before the court, they did so on an ad hoc basis and by the unsatisfactory method of drastically rewriting the statutes in order to provide appropriate mechanics. The situation certainly remained confused, as well as unclear with respect to other factual situations from both substantive and administrative standpoints. General legislative action was obviously needed.
New York first acted by L. 1892, c. 399, which, with subsequent amendments (L. 1897, c. 284 and L. 1899, c. 76), finally became the basis for our 1909 act and New Jersey's present law. To start with, it imposed the tax on the transfer rather than on the property transferred (although this change has little bearing on the problem before us). In the taxability *592 section it included the predecessor of paragraphs d(1) and d(2),[10] clearly designed to clarify the taxability of transfers involving contingent future interests. (It also rendered taxable, for the first time, transfers made in contemplation of death). To further ensure this object, it specifically provided the mechanics of appraisal, assessment and payment in such situations. New Jersey's solution of these mechanical problems in 1909 differed somewhat from that adopted in New York, which we need not detail, but the purpose of the changes and additions in both statutes was obviously the same.
The taxability section in the New York 1892 act was divided into three numbered paragraphs: First, covering transfers of resident decedents by will or intestacy; Second, covering like transfers of New York property by non-resident decedents; and Third, covering transfers made in contemplation of death or intended to take effect in possession or enjoyment at or after death. This third paragraph went on to provide in the last two sentences thereof: "Such tax shall also be imposed when any such person or corporation becomes beneficially entitled, in possession or expectancy, to any property or the income thereof by any such transfer, whether made before or after the passage of this act. Such tax shall be at the rate of five per cent upon the clear market value of such property * * *"[11] (Emphasis added). By L. 1897, c. 284, these last two sentences were placed in separate numbered paragraphs and another paragraph was added dealing with powers of appointment. The New York *593 law has remained in substantially this format ever since. (As we said earlier, the act was superseded by a new scheme of death taxes in 1930).
It is most important to note that at no time have New York courts ever held that the first of the two sentences just quoted, either before or after their placement in separate paragraphs, created an additional taxable category; rather, all the New York cases dealing with the question must be said to indicate the opposite. See, e.g., In re Seaman's Estate, supra (41 N.E. 401); In re Schmidlapp's Estate, 236 N.Y. 278, 140 N.E. 697 (1923); In re Dunlap's Estate, 205 App. Div. 128, 199 N.Y.S. 147 (1923).
The New Jersey 1909 act had its origin in Senate bill 153. The taxability section of the bill was a copy of our 1906 law which, as has been said, incorporated the New York 1892 language. The appraisal, assessment and payment sections were still essentially in the form found in our 1892 and 1903 acts. No statement of purpose was annexed to the bill, but study indicates it was primarily designed to vest authority and responsibility for the assessment and collection of the tax in a state officer, created by it, instead of, as formerly, in the Surrogates of the respective counties. A substitute bill was offered in the Senate, which is missing from the archives and cannot be located, and so we do not know its scope or intended purpose. Numerous amendments of the substitute were approved before its final passage, including one relating to the fourth paragraph of the taxability section, which put it in practically the same language as present paragraphs d(1) and d(2).[12] In addition, section 2 of *594 the act as finally adopted spelled out with particularity the mechanics for the appraisal, assessment and payment of taxes on tranfers involving vested future interests, and section 3 did the same with respect to those involving contingent future interests, including those resulting from the exercise of powers of appointment. The provisions of these sections are now found in N.J.S.A. 54:36-1 to 6, inc. None of these provisions gives any indication of intended application to inter vivos transfers other than those made in contemplation of death or to take effect at or after death.
While the language of the 1909 act and the current language of paragraph d(1) are different from that in the New York 1892 law and our earlier statutes, and while neither counsel nor ourselves have been able to discover its source or any contemporary expression of the reason for its selection, we are convinced, for the reasons heretofore and hereafter stated, that it was intended to mean no more than the paragraph's earlier forms in New York and this state, which, unquestionably, did not create an additional taxable category.
Our conclusion is strongly supported by the Bureau's administrative application of paragraph d(1) over the years. Admittedly its rules, regulations, and internal policies make no reference to it. The tax return forms now prescribed do not provide for or require the listing of inter vivos transfers under the Bureau's present conception of the paragraph. No one now connected with the agency can recall any prior estate where a tax was assessed or claimed on the basis now asserted; it is conceded that there have been, especially since the amendment of 1951, factual situations where paragraph d(1) could have been applied. All of this demonstrates to us an administrative interpretation of the paragraph which *595 warrants the application of the elementary rule that long standing construction of a statute by the affected agency is entitled to great weight.
As far as judicial precedent with respect to paragraph d(1) is concerned, the Bureau concedes there is none in this state or elsewhere. The paragraph has never previously been construed or applied by any of our courts. In fact, as far as we can discover, it has only even been mentioned in two cases, In re Huggins, 96 N.J. Eq. 275 (Prerog. 1924), affirmed o.b., sub nom., Fairleigh v. Bugbee, 3 N.J. Misc. 1072, 130 A. 923 (Sup. Ct. 1925), affirmed o.b. 103 N.J.L. 182 (E. & A. 1926) and Central Hanover Bank and Trust Co. v. Martin, supra (129 N.J. Eq. 186). In both, the transfers were found taxable on other bases and the paragraph was simply referred to parenthetically, without discussion of its purpose or scope.
Pennsylvania appears to be the only other state having a provision like paragraph d(1). That state added a substantially identical provision to the taxability section of its statute in 1919. P.L. 521; 72 Purdon's Statutes, § 2301d. Research discloses that it has never been construed; in fact it has been mentioned only in one appellate case, In re Good's Estate, 407 Pa. 642, 182 A.2d 721 (1962), and then without discussion of its purpose and scope. (Pennsylvania on January 1, 1962, as New York did years before, abandoned an inheritance tax scheme similar to ours). Counsel for the appellants advised at reargument that his investigation disclosed that, administratively, the Pennsylvania taxing authorities had never viewed the paragraph as creating a separate taxable category. The Bureau has not disputed this.
Moreover, several of the implications of the Bureau's position are so peculiar as, in themselves, to raise grave doubt that such could possibly have been the legislative intent. In this connection see the language in In re Perry's Estate, 111 N.J. Eq. 176, 180 (Prerog. 1932), quoted by this court in Darr v. Kervick, supra (31 N.J., at 486): "`[t]axing acts *596 being subject to strict interpretation, the taxpayer [is] entitled to the benefit of the doubt.'"
It is, of course, plain that the Bureau's view of the paragraph would leave untouched transfers where all interests were vested. As appellants put it in their brief:
"Exempt, according to the Bureau, is a transfer inter vivos to A for life, remainder to B. Both life estate and remainder vested at the date of transfer. Yet, taxable is a transfer inter vivos to A for life, remainder to B but if B shall predecease A, to B's issue surviving A. The interest of B is defeasible and that of B's issue contingent. Exempt is a transfer inter vivos to A for life. A's life interest is vested. Yet, taxable is an inter vivos transfer to A until A attains age 35, remainder at that time to A. * * *"
This lack of uniformity in the treatment of vested and contingent pre-death transfers makes little sense unless there exists some real reason to reach only the latter. We see none.
Further, the construction advanced would seemingly render superfluous the "at or after death" taxation basis except in those situations where such a transfer created only vested interests, and it would sanction the taxation of lifetime transfers where the grantor had divested himself of all interest and control and his death did not affect the devolution, so long as some interest in the transferred property was contingent and defeasible at the time of creation and remained unresolved at the grantor's demise. The interpretation proposed also would, to some extent, negative the 1951 amendment's prohibition against the taxation of a transfer made in contemplation of death and more than three years prior to that event if the transfer were in any way contingent or defeasible. Additionally it may be noted that the language of paragraph d(1) is so broad that it encompasses not only contingent inter vivos transfers, but also contingent testamentary transfers, which are already taxable by paragraph a of the section.
Even more significant is the fact that the Bureau's interpretation violates the basic rationale for the taxation of inter vivos transfers, i.e., because in reality they are substitutes for or in lieu of testamentary dispositions. Such is *597 the long established reason for the provisions taxing transfers made in contemplation of death or intended to take effect at or after death. See discussion under heading II, supra, and especially the analysis of Vice-Ordinary Buchanan in In re Brockett, supra (111 N.J. Eq., at 188-189) quoted therein. See also Renwick v. Martin, supra (126 N.J. Eq., at 576). Realizing the importance of this fundamental design of our statute, the Bureau, in its supplemental brief, attempted to make its view of paragraph d(1) conform with the basic rationale by urging that the actual, and indeed the only, purpose of the paragraph, was to tax all transfers involving contingent interests in order to plug one claimed loophole whereby taxation of a contingent transfer, actually intended to take effect at or after the grantor's death, could be avoided by varying the devolution. The argument is not persuasive and we are not convinced the paragraph had any such purpose.[13]
We therefore hold that no interest under any of the trusts is taxable by virtue of N.J.S.A. 54:34-1d(1), because that paragraph does not create a taxable category in addition to transfers made in contemplation of death or intended to take effect at or after death covered by N.J.S.A. 54:34-1c. This renders academic appellants' partial alternative argument that, even if paragraph d(1) were found applicable *598 to the 1954 trust, the income interests thereunder were vested and consequently any money paid the income beneficiaries after the settlor's death, not being taxable under any other provision of the statute, is not taxable at all.

Conclusion
We conclude that the Bureau was correct in taxing the entire 1959 trust as a transfer made in contemplation of death, but that it was in error both in taxing the remainders of the 1935 and 1959 trusts as transfers made to take effect at or after death and in taxing any interest in any of the trusts under N.J.S.A. 54:34-1, par. d(1). The assessment made on the 1959 trust is therefore affirmed and the assessments made on the remainder interest of the 1935 trust and on the entire corpus of the 1954 trust are set aside. The determination of the Transfer Inheritance Tax Bureau is modified accordingly and the matter is remanded to that agency for further consistent action. No costs to either party.
For modification  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN  7.
Opposed  None.
NOTES
[1] The following events have transpired since the settlor's death: Anne Boyd Dale has married and had a child. Louise and John Denny Dale were divorced October 17, 1960. Louise died December 15, 1967, after the first argument herein, survived by her two children and the just mentioned grandchild. No contention has since been made that Louise's death affects the questions presented on this appeal. Since she was an appellant in this cause as one of her mother's executors, her death is hereby suggested upon the record. R.R. 4:38-1(b).
[2] Subparagraph (2) of paragraph d refers to a second situation in this language:

"Property transferred pursuant to a power of appointment contained in an instrument taking effect on or after July fourth, one thousand nine hundred and nine."
Paragraphs e and f refer to two additional "cases": e, when a testator gives property to a fiduciary named in a will in lieu of commissions and the value of the legacy or devise exceeds reasonable compensation for such services; f, where property is held in certain types of joint ownership of the decedent and another or others and his interest passes on death to the survivor or survivors.
[3] It may be observed that both of these theories are first advanced since the legislature limited taxable transfers made in contemplation of death to those within three years of death. Prior thereto, many transfers made much beyond such a period were held taxable on this basis. Indeed, the Bureau's brief says that in all probability, were it not for the statutory limitation, the entire corpus of the 1935 and 1954 trusts would be subject to tax on this basis, a matter on which we need express no opinion.
[4] The trust was held not liable to taxation as a transfer in contemplation of death because created more than three years prior to the settlor's death. It was further found not subject to tax as a transfer to take effect at or after death on the thesis (applied to the 1935 trust) of a reversionary title or interest retained by the settlor, because the income estates were less than full life (freehold) estates.
[5] This finding of taxability of the entire corpus of the 1959 trust as made in contemplation of death renders academic the Bureau's determination that the remainder of the trust was also taxable as a transfer to take effect at or after death as well as under paragraph d(1). Nonetheless, since the parties have briefed the latter propositions as well and the questions thereby raised are novel and important, we shall consider taxability of the remainder of this trust under these additional theories along with that of the other two trusts under headings II and III, infra.
[6] Spiegel was subject to much criticism. See, e.g., Bittker, The Church and Spiegel Cases: Section 811(c) Gets A New Lease on Life, 58 Yale L.J. 825 (1949). The author, in urging (p. 839) that taxability ought to depend on whether the settlor has retained a real chance to recapture the corpus, said (p. 838) that the rule of that case and the decisions leading up to it "* * * will often be a tax on bad draughtsmanship. In fact, the niceties of conveyancing being what they are, even a careful draughtsman may find that he has not provided for every contingency because a remainder is less vested than he thought or because he has overlooked some other ancient loophole equally unrelated to the policy of the taxing statute. It now appears that the `unwitty diversities' and `elusive and subtle casuistries' of the law of property were not deported from the law of taxation by the Hallock case. They were rather elevated to new heights. Draughtsmen will have to study, as never before, the sacred books of Fearne, Gray, and Leake for the incantations which exorcise reversionary interests. The Government, for its part, will worship at the shrine of Contingent Remainder, Worthier Title, Condition of Survivorship, and similar tribal deities. The more tax-conscious the grantor, the more likely his success in propitiating these deities before his death. Only the naive and unsophisticated need be sacrificed".

Spiegel and its progenitors no longer represent the law under the federal estate tax statute. The statute was amended, first by the Technical Changes Act of 1949 and finally by section 2037 of the Internal Revenue Code of 1954, 26 U.S.C.A., § 2037, so that now, in substance, transfers (beyond those made in contemplation of death) are only taxable if possession and enjoyment of the property can be obtained only by surviving the decedent and the decedent has retained a reversionary interest in the property (which must be by express terms of the instrument if the transfer was made before October 8, 1949) and the value of such reversionary interest immediately before the decedent's death exceeds 50% of the value of such property. The same rule also now prevails in New York, we understand, since for some years that state has tied its death tax directly and identically to the federal estate tax.
[7] The ultimate remainder provision in the 1959 trust was to the intestate takers of the settlor under New Jersey law as of the date of the income beneficiary's death. That in the 1935 trust provides that the corpus shall be distributed on the death of the income beneficiary, if there is a failure of the specified remaindermen, as though the income beneficiary had died intestate while domiciled in New York and owning such property. The Bureau has not levied a tax on the 1935 remainder, or argued its right to do so, on the basis that, until the settlor's death, by this express provision, the settlor could take or share in the corpus as an intestate next of kin (the mother) of the income beneficiary if the latter predeceased without issue or a spouse. Cf. In re Fosdick, supra (102 N.J. Eq. 45). Since the question has not been dealt with by either side, we express no opinion thereon. We might observe in passing that it might be said, however, that the settlor then would take not because she had reserved an interest, but because her child had in effect donated it back to her. See Bittker, The Church and Spiegel Cases, supra (58 Yale L.J. at 830, n. 33, 837, n. 69). Also, many cases say that the date of the settlor's death rather than that of the creation of the trust is controlling. Carter v. Bugbee, supra (91 N.J.L. 438); Newberry v. Walsh, supra (20 N.J., at 490); Bridgeport-City Trust Co. v. Sullivan, supra (148 A.2d at 550). Here the income beneficiary survived the settlor and had a husband and two children at the date of the latter's death.
[8] It may also be noted that, as shown by the record in this case, the transfer inheritance tax return form prescribed by the Bureau does not provide for or require the listing of inter vivos transfers on the basis of the theory here relied upon.
[9] It is to be noted that in its first brief the Bureau contended that paragraph d(1) rendered taxable, upon the transferor's death, all transfers made by that person since July 4, 1909 which involved contingent interests even though, prior to death, the contingency had been resolved and devolution had been finally determined. On reargument this position was modified to limit application to situations where an outstanding contingent or defeasible interest remained unresolved at the death of the transferor. We observe, however, that, if, as the Bureau argues, the legislature intended to create a separate category of taxable transfers, there would seem no warrant from the language of paragraph d(1) to limit application solely to cases of unresolved contingencies.
[10] Paragraph d(2), quoted in footnote 2, deals specifically with power of appointment situations on generally the same thesis as other contingent transfers.
[11] New Jersey made the same change in the taxability section of its original statute by L. 1906, c. 228, p. 432, without, however, making any alteration of the mechanics sections. Previously, by L. 1903, c. 90, p. 128, it had added a section dealing with the time of appraisal, assessment and payment of taxes involving remainder interests, which, however, in view of the failure of the prior mechanics sections, only made the situation more confusing.
[12] The concluding phrase referred to instruments taking effect "after the passage of this act" (which is expressed in the current form as July 4, 1909). The corresponding section in the New York 1892 law covered transfers "whether made before or after the passage of this act". (Emphasis added). It has been suggested that at least another reason for paragraphs d(1) and d(2) is found in this distinction, i.e., that the paragraphs were adopted to avoid problems of retroactive application which had arisen in New York in cases of transfers where the instrument took effect before the passage of the statute but the final resolution of the contingent remainder occurred afterward. See e.g., In re Seaman's Estate, supra (41 N.E. 401); In re Pell's Estate, 171 N.Y. 48, 63 N.E. 789, 57 L.R.A. 540 (1902); In re Craig's Estate, 97 App. Div. 289, 89 N.Y.S. 971 (1904), affirmed o.b. 181 N.Y. 551, 74 N.E. 1116 (1905). We need not pass on the contention.
[13] In the light of our conclusion as to the real reason for paragraph d(1), we need not reach appellants' constitutional argument that, as construed by the Bureau, it violates equal protection and due process. We may, however, note Vice-Ordinary Buchanan's observation in Renwick v. Martin, supra (126 N.J. Eq., at 578):

"Indeed, the fact that the difference between transfers made in lieu of testamentary disposition and those which are not so made is a very real and vital difference was determined in Schlesinger v. Wisconsin, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926), * * * which holds, in effect, that an inter vivos transfer which was not in fact a transfer in lieu of testamentary disposition could not validly be taxed under an inheritance transfer tax statute."
Schlesinger, on this analysis, held unconstitutional on equal protection and due process grounds a state inheritance tax statute establishing a conclusive presumption that every transfer made within six years of death was made in contemplation thereof.